**JESSICA J. OLIVA**
California State Bar No. 312435
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Jessica_Oliva@fd.org

Attorney for Ms. Mindy Lynn Conner

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>MINDY LYNN CONNER,<br><br>　　　　　　　Defendant. | CASE NO.:　21-cr-01293-001-CAB<br><br>Hon. Cathy Ann Bencivengo<br>Courtroom 15A<br>Date: August 5, 2022<br>Time: 9:00 a.m.<br><br>**MS. CONNER'S SENTENCING MEMORANDUM** |

## I.　Introduction

Ms. Conner is a soft-spoken woman who has survived unimaginable hardship. Now 50-years-old, her life has been marked by domestic abuse, addiction, untreated mental illness, and the loss of loved ones. Her involvement in the instant offense resulted from financial desperation, in part due to a stroke she had in 2020 which made it impossible for her to work. Imminently facing homelessness, Ms. Conner made a poor decision while in the grips of her addiction.

At her sentencing date, Ms. Conner will have spent 479 days in custody. This period of time has prompted deep reflection and a reconnection with her faith. She has found an internal resilience she did not know she had previously, pushing herself mentally and physically toward recovery on all fronts. She has been accepted into a residential treatment program where she can get professional help to manage her mental illness and addiction, which is what she truly needs. She sees this as a critical opportunity to turn her life around and find much-needed peace and stability.

For these reasons, and the reasons detailed below, Ms. Conner respectfully requests a sentence of time served, coupled with a condition that she complete the residential treatment program at Hacienda Valdez.

## II. Mindy Lynn Conner

### A. Background

Ms. Conner was born in American Fork, Utah and her parents separated when she was just a baby. Her father did not allow her mother to be part of her life and Ms. Conner did not have contact with her mom until around the age of 15. She lived with her father, who remarried four times throughout her childhood. She had various stepsiblings that came in and out of her life from these marriages.

Ms. Conner's young life was marked by instability. The family moved around frequently, living for some time in Arizona, Florida, Idaho, Indiana, Texas, Nevada and Colorado, among other places. She never had enough time to make friends in a new place. Without notice, her dad would come home with moving boxes, telling her "whatever you want better fit in that box," and they would leave that day. Her father was in and out of jail frequently for writing bad checks.

Ms. Conner was often left alone with her stepmothers. From the age of three to six years old, Ms. Conner was physically and sexually abused by her first stepmother and her stepmother's brother. Upon learning of the abuse, her father reported it to the police and separated from his wife. The brother served six months in prison for "annoyance of a child." Ms. Conner had challenging relationships with her other stepmothers and only remembers becoming close with one. One of her stepmoms was only ten years older than her, causing friction in her teenage years. The poor relationship resulted in her being a "rebellious kid." She often ran away from home to spend time with her boyfriend.

At the age of fifteen, Ms. Conner was thrust into adulthood when she became pregnant with her first son, Jason. She dropped out of the 10th grade—though in later years completed her GED—and lost touch with her baby's father. At the age of

seventeen, after several cross-country moves, Ms. Conner moved out of her parent's house to live with a new boyfriend who she subsequently married. They had two daughters together: Evan and Crystal.

Her first husband was extremely physically abusive towards her, and after a year, she was desperately trying to escape. At the age of eighteen, she had managed to get herself and her small children into a domestic violence shelter. As she struggled to get back on her feet, her dad convinced her that it would be best for her to leave her kids with family in Utah and start fresh elsewhere. Her dad took Jason, her aunt took Evan, and her aunt's sister-in-law took Crystal. Ms. Conner still breaks down when she recalls this difficult decision.

Her father put her on a bus to California to live with her mother, but the environment there was equally, if not more, unstable. Her mom soon fled the state, leaving Ms. Conner to pay the bills. Ms. Conner was introduced to methamphetamine by the poor influences around her and started smoking it regularly.

At the age of nineteen, Ms. Conner married her second husband, Anthony, after becoming pregnant with her fourth child, Anthony Jr. Anthony was an alcoholic and their relationship became so abusive that Ms. Conner began seriously harming herself. She started cutting her wrists on a regular basis and attempted suicide twice: once trying to hang herself and another time attempting to overdose on pills. She sent their son to live with her father in Utah because she felt it was inevitable that bad things would happen in this toxic environment.

In her early to mid-twenties, Ms. Conner fell deeper into the throes of her addiction and started to have contact with law enforcement. While in jail in 1996, she learned that her husband, Anthony, had died in an accident. Ms. Conner became more and more transient at this stage of her life.

In 1997, she learned that her eight-year-old daughter, Evan, passed away. Evan had been in her aunt's care in Utah and was run over by a car. The loss of her daughter created unimaginable pain. She is still unable to speak about Evan or what this time

was like for her.

After her release from custody, Ms. Conner returned to California and had her youngest son, Michael. She had a short, but positive relationship with his father until she relapsed and he took custody of their son. She experienced a few years of sobriety until 2007, when she met a man named Michael who got her back into drugs. She describes their seven-year relationship as "toxic and abusive" and him as a "violent and crazy person." Still, she says that she might never have had the strength to leave him if he had not died of a heart attack. Throughout their relationship, they were homeless and lived together in a makeshift hut in the bushes. She describes using methamphetamine often because it was easier to "tolerate his craziness if you were there with him."

During this relationship, she began to cut herself again, and at one point was hospitalized for a suicide attempt. Ms. Conner was also diagnosed around this time for bipolar II disorder, borderline personality disorder, and drug-induced psychosis. Ms. Conner has been medicated for short periods of time, but has never had long-term treatment to help her manage her symptoms. Instead, Ms. Conner has heavily relied on methamphetamine to self-medicate.

After Michael's death, Ms. Conner began to live in a tent on her own near Lake Elsinore and eventually started staying with a friend in his home. She describes the home as a stressful environment full of people. At this point, her physical health had declined significantly over the years. Daily use of drugs, alcohol, and cigarettes had taken a toll and she was overweight with high blood pressure and cholesterol. In June 2020, she had a debilitating stroke that left her barely able to walk and properly care for herself. *See* Exhibit A. She struggled to regain control of her left arm and leg. The stroke left her in a state of anguish on all levels. *Id.* As she describes in her letter, "[a]fter my stroke, I did not care whether I lived or died . . . prior to my arrest, my days were distressing and humiliating. The physical damage from my stroke was extensive, I could not comb my hair, barely walk, and even more humiliating, I required assistance

to dress." *See* Exhibit B.

Not only was Ms. Conner struggling physically and mentally, she was also imminently losing her housing. The friend she was staying with rent-free for about two years was going to move to another state. Without the ability to work, she knew she was likely facing homelessness yet again. She learned from a friend about "guys in Mexico who would take care of you" if you crossed drugs. In a state of hopelessness for the future and fueled by her ongoing addiction, she regrettably agreed to do it.

When Ms. Conner was caught at the border, she had her dog Shannon with her—her closest companion for the past seven years. Shannon was taken at the border, adding yet another loss that weighs heavily on Ms. Conner.

**B.     The Future**

Ms. Conner has now been in custody for one year and nearly four months. She feels great remorse for her actions. At the time of her arrest, she was unmedicated for her bipolar disorder and feels this likely contributed to her poor decision. When she arrived in custody, she suffered from a deep depression and suicidal thoughts. After having gone without access to health care for years, she was placed in medical housing for the first few months in custody to manage the ongoing effects of her stroke and to receive treatment for her psychological symptoms.

As she recovered physically, she was brought to Santa Ana. Over the weeks and months that followed, she regained her will to live with a group of supportive women around her. As her cellmate writes in her letter of support, "[s]omething changed within her soul. She began to care. Not just about people but about herself and life." *See* Exhibit C. Ms. Conner began to find herself again through sobriety. She started exercising with the help of a friend, creating her own physical therapy routine to strengthen her muscles. After she "got her walk down," she realized one day that she could finally jog. She now jogs on a daily basis which helps her to clear her mind. By teaching herself to walk and to run again, she feels that she has proven to herself that recovery on all levels is possible for her.

She has also found religion and is interested in becoming a nun. This was something she had thought about doing in her twenties, but the dream became impossible as she fell deeper into her addiction. She has spoken with a priest about the possibility of pursuing this path now. She wants to help people, particularly young people, to get on the right path and feels with her experiences she might be able to connect with those who are struggling.

If becoming a nun is impossible, she hopes to work. Since she is now able to walk, she would aim to get a "simple job" at a place like Home Depot or to become a housekeeper, with a goal of establishing a housekeeping business of her own. She wants to live a calm and peaceful life. She is hopeful to continue to strengthen ties with her kids, some of whom she remains in touch with, but others who she is just re-establishing a relationship with.

This experience in custody has been life-changing for Ms. Conner. In her words: "I have regained my sense of self-worth and believe I have found a new lease on life I never thought possible." *See* Exhibit B. She is eager to pursue substance abuse and mental health treatment, and to continue to dive into her faith. She has been accepted into Hacienda Valdez, which will allow her to do just that. *See* Exhibit D. She is hopeful for the future, and for the first time sees a path forward to not only survive, but thrive.

### III. The Guidelines

#### A. The Court should grant minor role in this case.

In this case, nearly every single factor weighs in favor of a role adjustment. The government and Ms. Conner both recommend that the Court grant minor role.

- ✓ *The degree to which the defendant understood the scope and structure of the criminal activity.* Ms. Conner at all times only acted at the direction of her recruiter. She had no knowledge about the scope and nature of the drug trafficking organization. She had no knowledge of the quantity or type of drugs she was transporting, where they were located in the car, or where she would be directed to drive the car after she crossed it.

- ✓ *The degree to which the defendant participated in planning or organizing the criminal activity.* None.
- ✓ *The degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority.* None. Ms. Conner made no independent decisions, nor had any influence about the operation of the scheme.
- ✓ *The nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts.* Ms. Conner served the very limited role of driving the car across the border; she had no role in supplying, loading, or distributing the drugs. Moreover, she had no discretion on how to carry out her limited task. This offense constitutes her first and only attempt at crossing drugs.
- ✓ *The degree to which the defendant stood to benefit from the criminal activity.* Though Ms. Conner stood to benefit from her participation, it was only going to be a mere fraction of the likely street value of the contraband she was transporting.

**B.  Guidelines calculations**

In this case, Ms. Connor requests the following Guidelines calculations:

| | |
|---|---|
| Base Offense Level [§ 2L1.1(c)(2)] | 38 |
| Minor Role [§ 3B1.2(b)] | -2 |
| Safety Valve [§§ 2D.1.(b)(18); 5C.2] | -2 |
| Acceptance of Responsibility [§ 3E1.1(a)-(b)] | -3 |
| Fast Track [§ 5K3.1] | -4 |
| <u>Total Offense Level</u> | 23 |

At a Criminal History Category VI, her resulting Guideline range is 92-115 months. Ms. Conner has already served 479 days in custody. She asks the Court to allow her to complete her sentence with a residential treatment program where she can get the help she needs. These conditions would represent time, effort, and sacrifice by

Ms. Conner, and would address both rehabilitative and deterrence purposes.

**IV.    The Court should grant Ms. Conner a variance from the Guidelines range.**

As this Court knows, it has considerable discretion in choosing an appropriate sentence for Ms. Conner. Notably, all parties in this case agree that a variance is warranted. *See* ECF No. 40, Government SSC; ECF No. 39, Pre-Sentence Report. A sentence of time served in custody with the condition that she complete residential treatment at Hacienda Valdez is the appropriate sentence.

Ms. Conner more than anything is in need of treatment for her substance abuse and her mental health. As described in detail above, Ms. Conner has struggled nearly her entire life with addiction. She believes her untreated mental health issues have fueled some of the worst periods of substance abuse in her life and have resulted in poor choices like the one that brings her in front of the Court today. She is remorseful for her actions and takes complete responsibility for her involvement. She no longer wants to be controlled by her addiction.

As discussed in detail above, Ms. Conner's history and characteristics are mitigating. Ms. Conner has not had an easy life. She suffered from early childhood sexual and physical abuse, along with general instability and lack of support, which no doubt has had long lasting effects in her life.[1] Since she was a teenager, Ms. Conner

---

[1] Research supports these "adverse childhood experiences" undeniably have a long-lasting and profound effect on individuals' emotional states. *See* Vincent J. Felitti & Robert F. Anda, *The Relationship of Adverse Childhood Experiences to Adult Medical Disease, Psychiatric Disorders, and Sexual Behavior: Implications for Healthcare* 7, in *The Hidden Epidemic: The Impact of Early Life Trauma* (2009) (R. Lanius and E. Vermetten, eds.), http://www.acestudy.org/yahoo_site_admin/assets/docs/LaniusVermetten_FINAL_8-26-09.12892303.pdf. Indeed, early adversity has such long lasting impacts that the Center for Disease Control and Prevention has identified it as a significant risk factor. Adverse childhood experience can cause so much damage that at least one District of Alabama judge has determined that a defendant's childhood trauma can have a mitigating effect on culpability. *See United States v. Carter*, No. 2:20cr12-MHT, 2020 WL 7312182 * 15 (M.D. Ala. Dec. 11, 2020) ("Ignoring the effects of childhood trauma

has suffered at the hands of domestic abusers in a variety of toxic romantic relationships. In the worst of these relationships, she attempted suicide multiple times due to her inability to see a way out. Ms. Conner has also experienced loss that many of us could never imagine, including the death of her young daughter while she was incarcerated. She has suffered from physical ailments in custody and has grappled with the lasting effects of her debilitating stroke in 2020, training herself to regain her mobility.

Ms. Conner is at her core a peaceable person, who wants nothing more than to put her tumultuous years of addiction and mental illness behind her. She has her GED and is eager to pursue a path as a Catholic nun so that she can support others who have similarly struggled in life. She is enthusiastic about receiving substance abuse and mental health treatment in an environment that will support her with housing and employment, and allow her to dive deeper into her faith. She recognizes that this is a critical juncture in her life and that it would be an extraordinary opportunity for the Court to allow her to pursue this program.

//
//
//
//
//
//
//
//
//
//

---

would needlessly limit this acknowledgment to people who experience trauma. This strikes the court as particularly inappropriate in light of the apparent impacts of childhood trauma on brain development and functioning.").

**V.     Conclusion**

Ms. Conner finally feels that her life is worth living and sees that she has the internal resilience to change her old ways. She made a poor, ill-conceived decision fueled by her addiction and financial desperation, and is deeply remorseful for the mistakes she has made. With the support of Hacienda Valdez, Ms. Conner knows that she is capable of achieving sobriety, managing her mental illness, and finding meaning and stability through her religion and honest work. She respectfully requests that the Court allow her the opportunity to enroll and complete her sentence with residential treatment. This is the sufficient, but not greater than necessary sentence in this case.

Respectfully submitted,

Dated:  August 1, 2022         *s/ Jessica J. Oliva*
                               Federal Defenders of San Diego, Inc.
                               Attorney for Ms. Mindy Lynn Conner
                               Email: Jessica_Oliva@fd.org